1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ABM INDUSTRIES, INC. ET AL.,                    No. C 05-3480 SBA

　　　　　Plaintiffs,                    **ORDER**
　　　　　　　　　　　　　　　　　[Docket No. 30, 36, 42, 56]
　　v.

ZURICH AMERICAN INSURANCE
CO., ET AL.,

　　　　　Defendants.
_____/

　　　　　This matter comes before the Court on plaintiffs ABM Industries, Inc. and AMPCO System Parking's (collectively, "Plaintiffs") Motion for Partial Summary Judgment [Docket No. 30]; National Union's Motion for Summary Judgment [Docket No. 36]; and various evidentiary objections asserted by Plaintiffs and National Union [Docket No. 42, 56].  Having read and considered the arguments presented by the parties in the papers submitted to the Court, the Court finds this matter appropriate for resolution without a hearing.  The Court hereby DENIES Plaintiffs' Motion for Partial Summary Judgment [Docket No. 30] and GRANTS National Union's Motion for Summary Judgment [Docket No. 36], except to the extent that National Union argues that the Retained Limit of the National Union Policy has not been exhausted in this matter.  The Court further OVERRULES Plaintiffs' evidentiary objections [Docket No. 56].  The Court SUSTAINS National Union's evidentiary objections, except for the objection regarding paragraph 19 of the Sances Affidavit for Plaintiffs' Motion for Summary Judgment, which the Court OVERRULES [Docket No. 42].

**BACKGROUND**

**A.    Factual Background**

Plaintiffs ABM Industries, Inc. ("ABM") and AMPCO System Parking ("AMPCO") filed a complaint against Zurich American Insurance Company ("Zurich"), National Union Fire Insurance Company of Pittsburgh, PA ("National Union") (collectively, "Defendants") and Certain John Doe Insurance Companies, asserting counts for declaratory judgment, breach of contract, and tortious breach of the implied covenant of good faith and fair dealing.  Second Amended Complaint ("SAC").

Plaintiff ABM is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in San Francisco, California.  *Id.* at ¶ 2.

Plaintiff AMPCO is a corporation organized and existing under the laws of the state of California, with its principal place of business in Los Angeles, California.  *Id.* at ¶ 3.  AMPCO is a subsidiary of ABM.  *Id.*

Defendant Zurich is a corporation organized and existing under the laws of the state of New York, with its principal place of business in Schaumburg, Illinois.  *Id.* at ¶ 4.

Defendant National Union is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business in New York, New York.  *Id.* at ¶ 5.

At all relevant times, Zurich and National Union are and were licensed to transact the business of insurance in the state of California; Zurich and National Union do and did transact business in the state of California.  *Id.* at ¶ 7.

**1.    Zurich Policy**

Zurich sold to ABM a primary commercial general liability policy ("Zurich Policy"), which had a policy period from June 1, 2003 to June 1, 2004.  *Id.* at ¶ 12; Ellison Affidavit, Ex. A (Zurich Policy).  Both ABM and its subsidiary AMPCO are specified as named insureds of the Zurich Policy.  SAC at ¶ 13;  Ellison Affidavit, Ex. A (Zurich Policy).  The Zurich Policy has a general aggregate limit of $2,000,000, subject to a deductible of $150,000.  SAC at ¶ 14.

United States District Court

For the Northern District of California

Under Coverage A of the Zurich Policy, Zurich provides coverage to ABM for "property damage" caused by an "occurrence." *Id.* at ¶ 15.  Property damage" is broadly defined to include "Loss of use of the tangible property that is not physically injured." *Id.* at ¶ 16.  "Occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at ¶ 17.

Under Coverage B of the Zurich Policy, Zurich provides coverage to ABM for "personal and advertising injury." *Id.* at ¶ 18.  "Personal and advertising injury" means injury "arising out of," among other things, "Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." *Id.* at ¶ 19.

**2.      National Union Policy**

National Union sold to ABM a commercial umbrella policy ("National Union Policy") which had a policy period from November 1, 2002 to November 1, 2003. *Id.* at ¶ 20; National Union MSJ, Ex. 5 (National Union Policy).  ABM is listed as a named insured of the National Union Policy, and the definition of "Named Insured" includes subsidiaries of ABM like AMPCO. SAC at ¶ 21; National Union's Motion for Summary Judgment ("National Union MSJ"), Ex. 5, at 3 (National Union Policy).

The National Union Policy has a per occurrence limit of $25,000,000, as well as a $25,000,000 general aggregate limit.  SAC at ¶ 22.  The National Union Policy has one coverage part, providing ABM with coverage for "Bodily Injury, Property Damage, Personal Injury or Advertising Injury" that is "caused by an Occurrence." *Id.* at ¶ 23.  "Property Damage" is broadly defined to include "Loss of use of tangible property that is not physically injured." *Id.* at ¶ 24. "Personal Injury" means "Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organizations's good, products or services." *Id.* at ¶ 25. "Occurrence" means:

> 1. As respects Bodily Injury or Property Damage, an accident, including continuous or repeated exposure to conditions, which results in Bodily Injury or Property Damage

3

neither expected nor intended from the standpoint of the Insured.  All such exposure to substantially the same general conditions shall be considered as arising out of one occurrence;

2.  As respects Personal Injury, an offense arising out of your business that results in Personal Injury.  All damages that arise from the same or related injurious material or act shall be considered as arising out of one Occurrence, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants; and

3. As respects Advertising Injury, an offense committed in the course of advertising your goods, products and services that results in Advertising Injury.  All damages that arise from the same or related injurious material or act shall be considered as arising out of one Occurrence, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.

*Id.* at ¶ 27.

### 3.    Underlying Facts

On November 26, 1996, A.P.C. Holdings ("A.P.C") entered into a lease with Budget Rent-a-Car Systems, Inc. ("Budget"), whereby Budget leased to A.P.C. ("Budget Lease") a parcel of land that is 50 feet wide, containing approximately one-half acre ("Budget Parcel").  *Id.* at ¶ 30.  The Budget Parcel provided access from JFK Boulevard to a 26.25 acre tract of land to the east that was optioned by A.P.C.  *Id.*

On September 29, 1997, A.P.C., along with other investors, formed IAH-JFK Airport Parking, L.L.C.  *Id.* at ¶ 31.  On November 19, 1997, IAH-JFK Airport Parking and ANTAC, Inc. formed a general partnership named IAH 97 Joint Venture in order to own and develop the 26.25 acre tract of land.  *Id.* at ¶ 32.  The IAH 97 Joint Venture Agreement contained a Buy-Sell provision.  *Id.*

On January 6, 1998, AMPCO entered into a lease with IAH 97 Joint Venture for the 26.25 acre tract of land.  *Id.* at ¶ 33.  Pursuant to the lease ("Parking Facility Lease"), IAH 97 Joint Venture would construct a parking facility on this land.  *Id.*

The Parking Facility Lease "purportedly requires" that AMPCO enter into a Subordination, Non-Disturbance and Attornment Agreement ("SNDA") with IAH 97 Joint Venture's Mortgagee when requested to do so by IAH 97 Joint Venture or its Mortgagee.  *Id.* at ¶ 34.

In December 1998, the parking facility was built, and operations commenced.  *Id.* at ¶ 35.

4

On September 27, 2000, IAH 97 Joint Venture purchased from Budget the Budget Parcel.  *Id.* at ¶ 36.  IAH-JFK Airport Parking alleges that the contract implied that the fee simple and leasehold interests were not merged because the two property interests were sold separately.  *Id.*

On June 6, 2003, ANDV 97, Inc. (which is a subsidiary  of American National Insurance Co., which is assignee under the joint venture agreement of ANTAC) triggered the Buy-Sell provision of the IAH 97 Joint Venture Agreement.  *Id.* at ¶ 37.  According to IAH-JFK Airport Parking, the Buy-Sell provision would expire on September 4, 2003.  *Id.*  IAH-JFK Airport Parking responded to ANDV 97, Inc., by indicating its desire to purchase the other share of the 26.25 acre tract of land.  *Id.*

On or about August 13, 2003, IAH-JFK Airport Parking claims to have obtained financing for the buy-out from Whitney National Bank in the amount of $17,500,000.  *Id.* at ¶ 38.

On August 27, 2003, AMPCO sent a Tenant Estoppel Certificate to Whitney National Bank.  *Id.* at ¶ 39.  In that Certificate, AMPCO alleged that the fee simple and leasehold interests of the Budget Parcel merged after IAH 97 Joint Venture purchased the Budget Parcel from Budget.  *Id.* at ¶ 39-41.  AMPCO argued in the Certificate that this merger rendered the terms of the Budget Lease "null and void," such that no monthly rental payments would be due on the Budget Lease.  *Id.*

AMPCO alleges that it made accidental and negligent false statements in the Tenant Estoppel Certificate.  *Id.* at ¶ 40.  IAH-JFK Airport Parking alleges that AMPCO's false statements hurt the value of the business of IAH-JFK Airport Parking by, among other things, stating that the Budget Lease was null and void and that no monthly rental payments would be due under it.  *Id.* at ¶ 41.  IAH-JFK Airport Parking alleges that AMPCO's false statements directly caused Whitney National Bank to refuse to consummate the loan to IAH-JFK Airport Parking.  *Id.* at ¶ 42. Furthermore, IAH-JFK Airport Parking alleges that AMPCO's statements hurt IAH-JFK Airport Parking's opportunity to obtain financing from a second source, Aladdin Developers, Inc.  *Id.* at ¶ 43.  As a result of AMPCO's conduct, IAH-JFK Airport Parking asserts that it lost the right to purchase, own, and use the 26.25 acre parcel of property.  *Id.* at ¶ 44.  On September 8, 2003 ANDV 97, Inc. invoked its

right to purchase IAH-JFK Airport Parking's interest in the IAH 97 Joint Venture.  *Id.*

### 4.    Underlying Action

On December 5, 2003, IAH-JFK Airport Parking ("Underlying Plaintiff") filed a complaint (Civil Action No. H-04-0157) in the United States District Court for the Southern District of Texas, naming as defendants AMPCO, ABM, and three other entities which were subsequently dismissed ("Underlying Action").  *Id.* at ¶ 28.  Underlying Plaintiff filed its First Amended Complaint ("Underlying Complaint") on December 17, 2004; the Underlying Complaint stated tortious interference, breach of contract, and civil conspiracy claims against ABM and AMPCO.  *Id.* at ¶ 29.

ABM gave notice of the Underlying Action to Zurich on May 27, 2005, and to National Union on June 23, 2005.  *Id.* at ¶ 45.

Zurich wrote a letter to ABM, mailed on August 3, 2005, in which Zurich summarily denied coverage of ABM and AMPCO under the Zurich Policy.  *Id.* at ¶  46.  On August 17, 2005, ABM replied to Zurich's letter, requesting that Zurich reconsider its denial of coverage and informing Zurich of the location and time of the mediation between ABM and the Underlying Plaintiff.  *Id.* at ¶ 47-48.

National Union did not respond to ABM's tender.  *Id.* at ¶ 49.

The parties to the Underlying Action engaged in mediation on August 22, 2005.  *Id.* at ¶ 50. Representatives of Underlying Plaintiff and ABM attended the mediation.  *Id.* at ¶ 51.  Zurich and National Union sent coverage counsel to the mediation session to deny any obligation to participate in the settlement process.  *Id.*

The parties to the Underlying Action entered into a Binding Settlement Agreement dated August 22, 2005.  *Id.* at ¶ 52.  Pursuant to this settlement agreement, ABM would pay IAH-JFK Airport Parking a sum of $6,000,000 in full settlement of the Underlying Action.  *Id.* at ¶ 53.

The Binding Settlement Agreement was contingent on insurance coverage being provided by both Zurich and National Union.  *Id.* at ¶ 54.  ABM could reject the Agreement before September 12, 2005, "in the event that either or both of [its] insurance carriers, Zurich and National Union,

United States District Court

For the Northern District of California

either deny coverage or refuse to contribute to this Settlement to [its] satisfaction." *Id.*

The Binding Settlement Agreement did not go into effect due to Defendants' refusal to provide coverage to ABM and contribute to the settlement. *Id.* at ¶ 55.

After the first mediation session, Defendants failed to cooperate with ABM to resolve the Underlying Action. *Id.* at ¶ 56. Zurich wrote a second letter to ABM denying coverage to ABM on December 2, 2005. *Id.* at ¶ 57. National Union failed to provide ABM with a meaningful response to ABM's tender. *Id.* at ¶ 58.

The court hearing the Underlying Action denied all outstanding summary judgment motions by issuing an order, dated December 22, 2005. *Id.* at ¶ 59. ABM informed Defendants of this development on December 27, 2005. *Id.* By letter, dated December 27, 2005, ABM also informed Zurich and National Union that there would be a second mediation of the Underlying Action. *Id.* at ¶ 60.

The second mediation session was held on January 31, 2006, and Zurich and National Union again sent coverage counsel to the mediation session to deny any obligation to contribute their available insurance coverage to the settlement. *Id.* at ¶ 61.

The parties to the Underlying Action entered into a Settlement Agreement on January 31, 2006. *Id.* at ¶ 63. Pursuant to this settlement agreement, ABM was required to pay a sum of $6,250,000, plus the sum of $25,000 for the mediator's fees and $25,000 for the Underlying Plaintiff's trial preparation costs. *Id.* at ¶ 64. ABM has paid the amount of $6,300,000 to the Underlying Plaintiff to resolve the Underlying Action. *Id.*

Plaintiffs claim that they have satisfied all conditions precedent to triggering the obligations of the Defendants to provide full insurance coverage for the Underlying Action. *Id.* at ¶ 66. Plaintiffs' Second Amended Complaint seeks a declaratory judgment declaring that Zurich and National Union 1) had a duty to defend and are thus obligated to reimburse ABM for ABM's defense of the Underlying Actions, outside of the aforementioned policies' indemnity limits, and 2) should indemnify ABM for, or pay on behalf of ABM, any and all judgments or settlements reached in the

United States District Court

For the Northern District of California

Underlying Actions, until such time as the total aggregate limits of both the Zurich primary policy and the National Union first-layer umbrella policy have been exhausted.  Plaintiffs also state a cause of action for breach of contract, for Defendants' alleged breach of their obligations under the Zurich Policy and the National Union Policy.  Plaintiffs also state a cause of action for Defendants' breach of their duty of good faith and fair dealing.

**B.      Procedural History**

On August 26, 2005, Plaintiffs filed the original complaint against Zurich and National Union.

On September 6, 2005, Plaintiffs filed the First Amended Complaint.

On October 4, 2005, Zurich filed its Answer to the First Amended Complaint.

On October 18, 2005, National Union filed its Answer to the First Amended Complaint.

On January 1, 2006, Zurich filed its Motion for Summary Judgment.

On January 27, 2006, Plaintiffs filed their Motion for Partial Summary Judgment.

On February 20, 2006, National Union filed its Motion for Summary Judgment.

On May 25, 2006, Plaintiffs filed their Second Amended Complaint.

On June 1, 2006, the Court filed an Order setting a hearing on the cross-motions for summary judgment for July 25, 2006.  This hearing was subsequently taken under submission.

On June 2, 2006, both Zurich and National Union filed their Answers to the Second Amended Complaint.

On July 27, 2006, Plaintiffs withdrew their Motion for Partial Summary Judgment as to Zurich, in light of a settlement agreement reached between the two parties.  Zurich, in turn, withdrew its Motion for Summary Judgment.

<u>**LEGAL STANDARD**</u>

**A.      Summary Judgment**

Under Federal Rule of Civil Procedure 56, a court may properly grant a motion for summary judgment if the pleadings and materials demonstrate that there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment may be granted in favor of a defendant on an ultimate issue of fact where the defendant carries its burden of "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325; *see Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577 (Fed. Cir. 1989).

To withstand a motion for summary judgment, the non-movant must show that there are genuine factual issues which can only be resolved by the trier of fact.  *Anderson*, 477 U.S. at 250.  The nonmoving party may not rely on the pleadings but must present specific facts creating a genuine issue of material fact.  *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The court's function, however, is not to make credibility determinations.  *Anderson*, 477 U.S. at 249.  The inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion.  *T.W. Elec. Serv.*, 809 F.2d at 631.

"[T]he district court has no obligation to search the entire case file for evidence that establishes a genuine issue of fact when the nonmovant presents inadequate opposition to a motion for summary judgment."  *The Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136-1137 (9th Cir. 2001).

When the parties file cross-motions for summary judgment, "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard."  *Riverside Two*, 249 F.3d at 1136 (quoting Charles Alan Wright, et al., 10A FEDERAL PRACTICE AND PROCEDURE § 2720, at 335-36 (3d ed. 1998)).  In doing so, the district court "must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them."  *Riverside Two*, 249 F.3d at 1134 (where the plaintiffs' papers opposing the defendant's motion for summary judgment relied on evidence that the plaintiffs submitted in support of their own motion for summary judgment, district court was required to review that evidence in

United States District Court
For the Northern District of California

1  determining whether it presented a disputed issue of material fact precluding summary judgment in

2  favor of defendants.)

3  　　Additionally, the evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e).

4  Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine

5  issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. City of Niagara*

6  *Falls*, 754 F.2d 49, 57 (2d Cir.1985); *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738

7  (9th Cir.1979).

8  **B.     Interpreting Insurance Policies**

9  　　In California the rules for interpreting insurance policies are as follows:

10  　　Insurance policies are contracts subject to ordinary rules of contract interpretation.
    Our goal is to give effect to the mutual intention of the parties when they entered into

11  　　the contract.  Whenever possible, we determine the parties' intent solely from the
    terms of the policy, giving those terms their ordinary and popular meanings, unless

12  　　the parties use terms in a technical or special sense.

13  *Modern Development Co. v. Navigators Ins. Co.*, 111 Cal. App. 4th 932, 938-39 (Cal. Ct. App.

14  2003) (citing *Safeco Ins. Co. v. Robert S.*, 26 Cal.4th 758, 763 (Cal. 2001); *Palmer v. Truck Ins.*

15  *Exchange*, 21 Cal.4th 1109, 1115 (Cal. 1999); *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807,

16  821-822 (Cal. 1990)).  Ambiguities are "generally resolve[d]. . . in favor of coverage." *AIU Ins. Co.*

17  *v. Superior Court*, 51 Cal. 3d 807, 822 (Cal. 1990).

18  　　Finally, "The burden is on an insured to establish that the occurrence forming the basis of its

19  claim is within the basic scope of insurance coverage.  And, once an insured has made this showing,

20  the burden is on the insurer to prove the claim is specifically excluded." *Aydin Corp. v. First State*

21  *Ins. Co.*, 18 Cal. 4th 1183, 1188 (Cal. 1998).

22  **C.     Duty to Defend**

23  　　The California state law regarding the duty to defend is as follows: "An insurer must defend

24  its insured against claims that create a *potential* for indemnity under the policy." *Scottsdale Ins. Co.*

25  *v. MV Transportation*, 36 Cal.4th 643, 654 (Cal. 2005) (emphasis in original).  "The duty to defend

26  is determined by reference to the policy, the [underlying] complaint, and all facts known to the

27

28  　　　　　　　　　　　　　　　　　　　10

insurer from any source." *Montrose Chemical Corp. of California v. Superior Court*, 6 Cal. 4th 287, 300 (Cal. 1993) (citation omitted).  Specifically,

> If any facts stated or fairly inferable in the [underlying] complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage. On the other hand, if, as a matter of law, neither the [underlying] complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first instance.

*Id*. at 655.

> Put another way,

> To prevail, the insured must prove the existence of a potential for coverage, while the insurer must establish the absence of any such potential. In other words, the insured need only show that the underlying claim may fall within policy coverage; the insurer must prove it cannot. Facts merely tending to show that the claim is not covered, or may not be covered, but are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage, therefore add no weight to the scales.

*Montrose*, 6 Cal. 4th at 300 (citation omitted).

The duty to defend "must be determined from the facts and inferences known to an insurer from the pleadings, available information and its own investigations at the time of the tender of defense."  *CNA Casualty of California v. Seaboard Surety Co.*, 176 Cal. App. 3d 598, 610 (Cal. Ct. App. 1986) (citation omitted).

Because the standard refers to "potential coverage," the duty to defend "may exist even when coverage is in doubt and ultimately is not established."  *Montrose Chemical Corp. of California v. Admiral Ins. Co.*, 10 Cal. 4th 645, 660 n. 9 (Cal. 1995).

"Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor."  *Haskel, Inc. v. Superior Court*, 33 Cal. App. 4th 963, 974 (Cal. Ct. App. 1995).

The California Supreme Court has clarified that the focus is on the facts, rather than the theories of recovery alleged in the underlying complaint, in ascertaining whether a duty to defend exists: an insurer "bears a duty to defend its insured whenever it ascertains facts which give rise to the potential of liability under the policy."  *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 276-77 (Cal. 1966).  "[T]he insurer's duty is not measured by the technical legal cause of action pleaded in the

11

underlying third party complaint, but rather by the potential for liability under the policy's coverage as revealed by the facts alleged in the complaint or otherwise known to the insurer." *CNA Casualty of California v. Seaboard Surety Co.*, 176 Cal. App. 3d 598, 606 (Cal. Ct. App. 1986)

<u>**ANALYSIS**</u>

**I.      EVIDENTIARY OBJECTIONS**

    **A.      Plaintiffs' Objections**

Plaintiffs assert two evidentiary objections [Docket No. 56] to Exhibit 5 of the Supplemental Declaration of Ellen Van Meir:

        **1.      Federal Rules of Evidence 401 and 403**

Plaintiffs object to Exhibit 5 of the Supplemental Declaration of Ellen Van Meir pursuant to Federal Rules of Evidence 401 and 403.  Plaintiffs argue that the documentary evidence from the Underlying Action attached to the Declaration raises issues of fact and is not relevant to the duty to defend which is a matter of law.  Plaintiffs also argue that "National Union is attempting to re-litigate the Underlying Action" and that this is impermissible on a motion for partial summary judgment.

The Court OVERRULES these objections.   Exhibit 5 of the Supplemental Declaration of Ellen Van Meir is relevant.  The exhibit provides evidence relevant to National Union's argument that some of Plaintiffs' claims are excluded from coverage under the National Union Policy by a provision in the policy which excludes "Personal Injury . . . Arising out of oral or written publication of material, if done by or at the direction of the Insured with knowledge of its falsity."  National Union MSJ, Ex. 5, at 8 (National Union Policy).  Pursuant to Federal Rule of Evidence 401, this evidence has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Plaintiffs fail to explain pursuant to Rule 403 how the "probative value" of this evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative

1    evidence."

2         **2.    Confidentiality**

3         Second, Plaintiffs object to Exhibit 5 on the grounds of confidentiality.  Plaintiffs explain

4    that "ABM produced many of the documents [in Exhibit 5] with a 'Confidential' stamp on the bottom

5    of their pages, indicating that they may not be disclosed outside of their intended forum, the

6    Underlying Action."  Plaintiffs argue that by "disseminating these documents, National Union is

7    violating ABM's right to confidentiality."  The Court OVERRULES this objection.

8         According to paragraph 2 of the Supplemental Declaration of Ellen Van Meir, these

9    documents are from the court file in the Underlying Action.  Ms. Van Meir declares further that

10   these documents "can be found within the PACER system at Document No. 65."  (Ms. Van Meir

11   appears to refer to the PACER system for the *Underlying Action* with this citation.)  If these

12   documents are available on PACER, they cannot be under seal and must be part of the public record

13   in the Underlying Action.  Therefore, any argument as to confidentiality is inappropriate.

14        **B.    National Union's Objections**

15        National Union asserts a number of evidentiary objections [Docket No. 42] to the Joint

16   Affidavit of Martin Sances, Esquire, In Support of Plaintiffs' Motion for Partial Summary Judgment

17   ("Sances Affidavit for Plaintiffs' MSJ"):

18        **1.    Paragraphs 11-12**

19        First, National Union objects to the statements in paragraphs 11-12 of the Sances Affidavit

20   for Plaintiffs' MSJ declaring that Zurich and National Union attended mediation proceedings in the

21   Underlying Action, and while there, denied any obligation to participate in the settlement process.

22   National Union argues that these are an inappropriate disclosure and characterization of

23   communications and positions taken at a mediation in violation of local rules and state laws that

24   provide for confidentiality of communications at mediation.

25        Plaintiffs claim that the confidentiality privilege belongs to the parties of the Underlying

26   Action, not to National Union, and explain that ABM obtained permission from the Underlying

27

28                                              13

Plaintiff to disclose facts regarding the mediation session. Plaintiffs cite no authority for their argument. The law and rules on point show Plaintiffs' rebuttal to be unavailing.

Pursuant to 28 U.S.C. § 652(d), "each district court shall, by local rule . . . provide for the confidentiality of the alternative dispute resolution processes and [] prohibit disclosure of confidential dispute resolution communications." In the Southern District of Texas, the forum for the Underlying Action and the mediation proceedings, Civil Local Rule 16.4.I. provides as follows:

> All communications made during ADR proceedings (other than communications concerning scheduling, a final agreement, or ADR provider fees) are confidential, are protected from disclosure, and may not be disclosed to anyone, including the Court, by the provider or the parties. Communications made during ADR proceedings do not constitute a waiver of any existing privileges and immunities. The ADR provider may not testify about statements made by participants or negotiations that occurred during the ADR proceedings. This provision does not modify the requirements of 28 U.S.C. § 657 [] applicable to non-binding arbitrations.

S.D. Tex. Civil Local Rule 16.4.I. The Rule is clear that the "all communications made during ADR proceedings" are confidential and may not be disclosed "to anyone" "by . . . the parties." Thus, the parties to the Underlying Action did not have the power to waive confidentiality. Their disclosure regarding the mediation violates S.D. Tex. Civil Local Rule 16.4.I.

Therefore the Court SUSTAINS National Union's objection regarding paragraphs 11-12 of the Sances Affidavit for Plaintiffs' MSJ and STRIKES these paragraphs from the record.

### 2.   Paragraph 16

Second, National Union objects that paragraph 16 of the Sances Affidavit for Plaintiffs' MSJ contains a legal conclusion not supported by factual data and is not proper affidavit testimony. Paragraph 16 refers to Zurich's and National Union's "continued reluctance to recognize their legal duties." This statement implying the existence of "legal duties" constitutes a legal conclusion—notwithstanding Plaintiffs' rebuttal that "[a]ll statements by Sances are factual in nature"—that may not be included in an affidavit, pursuant to Civ. L.R. 7-5(b). Civ L.R. 7-5(b) states, "An affidavit or declarations may contain only facts, must conform as much as possible to the requirements of [Federal Rule of Civil Procedure] 56(e), and must avoid conclusions and argument." Pursuant to Civ. L.R. 7-5(b), the Court SUSTAINS this objection and STRIKES paragraph 16.

14

**United States District Court**
For the Northern District of California

### 3.     Paragraph 18

Third, National Union objects to paragraph 18 of the Sances Affidavit for Plaintiffs' MSJ as inadmissible hearsay. Paragraph 18 states, "The most recent offer was for $7 million, and the Underlying Plaintiff is currently demanding $27 million." Plaintiffs argue that this is not inadmissible hearsay because Sances attended the mediation session and made all statements in the Affidavit based upon personal knowledge. While Sances may have personal knowledge of the statements in question, that does not constitute an exception to the hearsay rule under the Federal Rules of Evidence. Therefore, the Court SUSTAINS this objection and STRIKES paragraph 18.

### 4.     Paragraph 19

Fourth, National Union argues that paragraph 19 of the Sances Affidavit for Plaintiffs' MSJ is conclusory and is not supported by factual data. Paragraph 19 states, "To date, the Policyholders have expended in excess of $507,406 in defense costs in and for the Underlying Action (the 'Unpaid Defense Costs')." National Union argues that "[n]o documentation supporting this statement and the dates the costs were incurred has been produced. Further, plaintiffs have not established that the costs and expenses claimed were reasonable and necessary to their post-tender defense."

Plaintiffs rebut National Union's arguments by asserting a) that Mr. Sances "attested to this fact with personal knowledge" and b) that "documentation will be produced during the normal course of discovery in response to appropriate discovery requests." Indeed, Mr. Sances declares in his affidavit that he "make[s] this Affidavit based upon [his] own personal knowledge, acquired in [his position as Deputy General Counsel at ABM Industries, Inc.]." Paragraph 19 sets forth facts made on the personal knowledge of the affiant. Therefore, no supporting documentation is necessary. The Court OVERRULES this objection.

## II.     Cross-Motions for Summary Judgment

### A.     Choice of Law

Before reaching the merits of the cross-motions for summary judgment, the Court must first conduct choice of law analysis to determine whether to apply Texas—the forum of the Underlying

15

Action—or California—the forum in the instant matter—state law in interpreting the insurance

policies at issue.  The Court finds, for the reasons stated below, that California state law governs the

issues in this case.

The Court must apply California choice of law rules in this case, a diversity

jurisdiction case: "It is well-settled that in diversity cases federal courts must apply the

choice-of-law rules of the forum state."  *Estate of Darulis v. Garate*, 401 F.3d 1060, 1062

(9th Cir. 2005).  The California choice of law rule is as follows:

> In California, courts apply a three-part governmental interest test.  First, we
> must assess whether the foreign state law actually differs from the law of
> California.  If so, we then consider each state's interest in having its own law
> applied to this case to determine whether there is a "true conflict" between
> their interests. Finally, if each state has a legitimate interest, we compare the
> extent to which each state's interests will be impaired if the other state's law
> is applied.

*Id.* (citations omitted).  *See also North American Asbestos Corp. v. Superior Court*,

180 Cal. App. 3d 902, 905 (Cal. Ct. App. 1986) (same).

The Court must conduct "a separate conflict of laws inquiry . . . with respect to each

issue in the case."  *Washington Mutual Bank, FA v. Superior Court*, 24 Cal. 4th 906, 920

(Cal. 2001).

Although their reasoning differs, both Plaintiffs and National Union agree that

California law applies to matters of insurance policy interpretation and the determination of

the duty to defend.  Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' MSJ") at

10 n. 3; National Union MSJ at 10.  National Union reaches this conclusion after

ascertaining that there is no conflict between the laws of California and Texas on the

questions of coverage and policy interpretation at issue in this case.  National Union MSJ at

10.  By contrast, Plaintiffs assert that there are conflicts between California and Texas laws.

Plaintiffs Response to National Union MSJ at 5 n. 4.  However, Plaintiffs state that they

"agree that the Court should apply California law to this insurance coverage action" and cite

to the explanation stated in Plaintiffs' Motion for Partial Summary Judgment.  *Id.*  There,

Plaintiffs assert—citing the governmental interest test—that "[b]ecause California is the forum for this case, the Policyholders are located in California, and the Policies were sold in California to the Policyholders through a California broker, California law applies . . . ." Plaintiffs' MSJ at 10 n. 3.  It appears that Plaintiffs are arguing, pursuant to the governmental interest test, that California's interests would be impaired more if Texas law were to be applied in the issues in this case, than Texas' interests would be impaired if California law were to be applied in the issues in this case.

Ultimately, because all litigants agree that California law governs the issues of insurance policy interpretation and the determination of the duty to defend, according to California choice of law rules, the Court need not apply the governmental interest test to confirm the applicability of California state law to each of the issues in the instant matter:

> The fact that two states are involved does not in itself indicate that there is a "conflict of laws" or "choice of law" problem. . . .  "Only 'when it is suggested that the law of a foreign state should furnish the rule of decision' must the forum determine the governmental policy of its own and the suggested foreign laws, preparatory to assessing whether either or both states have an interest in applying their policy to the case." In short, generally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state.

*Hurtado v. Superior Court*, 11 Cal. 3d 574, 580, 581 (Cal. 1974) (citations omitted).

**B.     No Bodily Injury and No Advertising Injury**

As National Union observes, the Second Amended Complaint does not state any claims against National Union for "bodily injury."  Plaintiffs, who bear the burden "to establish that the occurrence forming the basis of its claim is within the basic scope of insurance coverage" and to "prove the existence of a potential for coverage," do not argue otherwise.  *Aydin*, 18 Cal. 4th at 1188; *Montrose*, 6 Cal. 4th at 300.  Therefore, the Court GRANTS National Union's Motion for Summary Judgment to the extent that Plaintiffs seek indemnification or a duty to defend for "bodily injury" under the National Union Policy.

Plaintiffs' Second Amended Complaint refers to advertising injury, but not to the advertising injury clause of the National Union Policy: "The Insurance Company

Defendants [Zurich and National Union] have asserted that the Policies do not provide the insurance coverage protection that ABM had purchased and expected would be available to protect ABM from liabilities such as the property damage and personal and advertising injury sustained by the Underlying Plaintiff." SAC at ¶ 70.  The reference to advertising injury here appears to refer solely to the "personal and advertising injury" clause of the Zurich Policy.  While the cross-motions between Zurich and Plaintiffs have been withdrawn from this case in the wake of a settlement agreement between the two parties, Plaintiffs' Motion for Partial Summary Judgment originally claimed that Zurich owed Plaintiffs a duty to defend based, in part, on the "personal and advertising injury" clause of the Zurich Policy.  Plaintiffs' MSJ at 15.  In their filings with the Court, Plaintiffs—who bear the burden "to establish that the occurrence forming the basis of its claim is within the basic scope of insurance coverage" and to "prove the existence of a potential for coverage"—make no reference to National Union's advertising injury clause.  *Aydin*, 18 Cal. 4th at 1188; *Montrose*, 6 Cal. 4th at 300.  National Union defines "advertising injury" as "injury arising solely out of your advertising activities . . . ."  National Union MSJ, Ex. 5, at 3 (National Union Policy).  The National Union Policy does not define "advertising," but the California Supreme Court has defined "advertising," in the context of an "advertising injury" provision of a commercial general liability insurance policy, to mean "widespread promotional activities usually directed to the public at large."  *Hameid v. National Fire Ins. of Hartford*, 31 Cal.4th 16, 24 (Cal. 2003).  Widespread promotional activities are not implicated anywhere in the Second Amended Complaint or in the Underlying Action. Therefore, the Court GRANTS National Union's Motion for Summary Judgment to the extent that Plaintiffs seek indemnification or a duty to defend for "advertising injury" under the National Union Policy.

> ### C.     Property Damage

Plaintiffs seek summary judgment, in part, on the proposition that National Union

owes a duty to defend to Plaintiffs for injuries in the Underlying Action that are potentially covered under the National Union Policy's property damage clause.

National Union, by contrast, seeks summary judgment, in part, on the proposition that National Union does not owe Plaintiffs either a duty to defend or indemnification pertaining to the property damage clause.

### 1.   No "Property Damage"

The National Union Policy provides indemnification and legal defense for "property damage."  National Union MSJ, Ex. 5, at 1 (National Union Policy).  The National Union Policy defines "property damage" as:

> 1.  Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
> 2.  Loss of use of tangible property that is not physically injured.  All such loss shall be deemed to occur at the time of the Occurrence that caused it.

*Id.* at 1, 6.

The first definition of property damage is inapplicable.  As National Union argues in its Motion for Summary Judgment, the Underlying Plaintiff did not state any allegations pertaining to physical injury to tangible property.  National Union MSJ at 13.  In a case interpreting an insurance policy, like National Union's, which covered "physical injury to tangible property, including all resulting loss of use of that property" and "loss of use of tangible property that is not physically injured," the California Court of Appeals held that "strictly economic losses like lost profits, loss of goodwill, loss of the anticipated benefit of a bargain, and loss of an investment, do not constitute damage or injury to tangible property covered by a comprehensive general liability policy."  *American International Bank v. Fidelity and Deposit Co. of Maryland*, 49 Cal. App. 4th 1558, 1565, 1572 (Cal. Ct. App. 1996).  In the Underlying Complaint, the Underlying Plaintiff sought damages for lost appreciation in value of the property and the loss of a stream of income arising from lease of the property. Underlying Complaint at ¶¶ 49-56.  As in *American International Bank*, these

United States District Court

For the Northern District of California

19

are damages for "strictly economic losses" and not for damage or injury to tangible property.  Hence, these claims are not covered under the physical injury to tangible property provision of the National Union Policy.

The second definition of property damage is also inapplicable.  The facts alleged in the Underlying Complaint do not encompass "loss of use of tangible property."  In *Collin*, the California Court of Appeal interpreted policy language almost identical to that contained in the National Union Policy—specifically defining "property damage," in part, as "loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."  *Collin v. American Empire Ins. Co.*, 21 Cal. App. 4th 787, 817 (Cal. Ct. App. 1994).  The California Court of Appeals held that

> "Loss of use" of property is different from "loss" of property. To take a simple example, assume that an automobile is stolen from its owner. The value of the "loss of use" of the car is the rental value of a substitute vehicle; the value of the "loss" of the car is its replacement cost.  The nature of "loss of use" damages is described in California Jurisprudence Third as: "The measure of damages for the loss of use of personal property may be determined with reference to the rental value of similar property which the plaintiff can hire for use during the period when he is deprived of the use of his own property."

*Id.* at 817 (citation omitted).  Again, in the Underlying Complaint, the Underlying Plaintiff sought damages for lost appreciation in value of the property and the loss of a stream of income arising from lease of the property. Underlying Complaint at ¶¶ 49-56.  As in *Collin*, these are damages for loss of property, rather than damages for temporary deprivation of the property.  Thus, as in *Collin*, these damages are not covered under loss of use provision of the National Union Policy.

### 2.    No "Occurrence"

Furthermore, even if the facts of Underlying Action raised a claim that satisfied the definition of property damage, such damage could not have been caused by an "occurrence," as is required for coverage under the National Union Policy.  The National Union provides

20

coverage for "property damage" only if the "property damage" "is caused by an

'occurrence.'"  National Union MSJ, Ex. 5, at 1, 6 (National Union Policy).  The National

Union Policy defines an "occurrence" as follows:

> As respects Bodily Damage or Property Damage, an accident, including continuous or repeated exposure to conditions, which results in Bodily Injury or Property Damage neither expected nor intended from the standpoint of the Insured.  All such exposure to substantially the same general conditions shall be considered as arising out of one Occurrence.

National Union MSJ, Ex. 5, at 5 (National Union Policy).

National Union argues that, according to Underlying Plaintiff's allegations, the

alleged "property damage" did not result from an accident, but rather from intentional

conduct.  National Union MSJ at 14.  Specifically, National Union argues that Plaintiffs

intended to assert that they were not obligated to make the Budget Lease payment in the

Tenant Estoppel Certificate.  *Id.*

Indeed, the Underlying Complaint alleges that AMPCO deliberately performed these

acts: "AMPCO sent a 'Tenant Estoppel Certificate' to Whitney National Bank" and, within

it, "AMPCO raised an entirely new claim" regarding the Budget Lease.  Underlying

Complaint at ¶ 22.  The same allegations of deliberate performance appear in Plaintiffs'

Second Amended Complaint: "AMPCO sent a 'Tenant Estoppel Certificate' to Whitney

National Bank," and, within that Certificate, "AMPCO alleged that the fee simple and

leasehold interests of the Budget Parcel merged . . . ."  SAC at ¶ 39.

In support of its argument that AMPCO's actions did not constitute an

accident—and hence an occurrence—National Union cites to *Merced*, a case interpreting

the "plain and ordinary" meaning of the word "accident."  *Merced Mutual Ins. Co. v.

Mendez*, 213 Cal. App. 3d 41 (Cal. Ct. App. 1989).  In *Merced*, the California Court of

Appeals held that an insurer had no obligation to defend the insured, because intentional

acts could not constitute an "accident." *Id.*  In *Merced*, in the underlying action, the insured

was sued for sexually assaulting a co-worker.  *Id*. at 44.  The insured's insurance policy

United States District Court

For the Northern District of California

provided indemnification and legal defense for "bodily injury or property damage caused by an occurrence" and, just like the policy at stake in the instant matter, the policy defined "occurrence" as "an accident."[1]  *Id.* at 45-46.  The court rejected the insured's argument that an "accident occurs even if the acts causing the alleged damage were intentional as long as the resulting damage was not intended."  *Id.* at 48.  The Court held that for an accident to occur, "both 'the means as well as the result must be unforeseen, involuntary, unexpected and unusual.'"  *Id.* at 50 (citation omitted).  "An accident . . . is never present when the insured performs a deliberate act unless some additional, unexpected, independent, and unforeseen happening occurs that produces the damage."  *Id.*  The court elaborated as follows:

> [W]here the insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an "accident" merely because the insured did not intend to cause injury. Conversely, an "accident" exists when any aspect in the causal series of events leading to the injury or damage was unintended by the insured and a matter of fortuity.  The following is illustrative.  When a driver intentionally speeds and, as a result, negligently hits another car, the speeding would be an intentional act. However, the act directly responsible for the injury—hitting the other car—was not intended by the driver and was fortuitous.  Accordingly, the occurrence resulting in injury would be deemed an accident.  On the other hand, where the driver was speeding and deliberately hit the other car, the act directly responsible for the injury—hitting the other car—would be intentional and any resulting injury would be directly caused by the driver's intentional act.

*Id.*  In *Merced*, the insured "admitt[ed] intentionally engaging in sexual activity with [the victim.]"  *Id.* at 50.

Similarly, in *Commercial Union*, the California Court of Appeals found that an insurance policy "did not cover an intentional firing by the insured of one of his employees."  *Commercial Union Ins. Co. v. Superior Court*, 196 Cal. App. 3d 1205, 1206

---

[1] The *Merced* policy also contained an exclusion of coverage for bodily injury or property damage "which is expected or intended by the insured."  *Merced*, 213 Cal. App. 3d at 44.  However, the case did not address the exclusion but rather turned on the scope of coverage itself, specifically, "whether the conduct in question constitutes an accident within the meaning of the policy provision."  *Id.* at 47.

United States District Court

For the Northern District of California

(Cal. Ct. App. 1987).  The insurance policy in that case covered bodily injury and property damage caused by an occurrence, where an occurrence was defined to be "an accident."  *Id.* at 1206-1207.  The court rejected the argument that "it is an occurrence within the meaning of the policy whenever the damages are not expected."  *Id.* at 1207.  The court explained that the plain meaning of "'accident' halts any argument that real party intended his act but not the resulting harm."  *Id.* at 1209.  In *Commercial Union*, there was "never . . . a suggestion that the termination was not intentional."  *Id.*

Plaintiffs advance two arguments explaining how AMPCO's actions regarding the Tenant Estoppel Certificate were accidental and hence qualify as an occurrence:

First, Plaintiffs argue that Whitney National Bank's decision to withdraw its financing is the "unexpected, unforeseen and independent happening . . . that produce[d] the injury," rendering the alleged property damage an accident under *Merced*.  Plaintiffs' Response to National Union MSJ at 11.  The Court finds that Plaintiffs' argument is unavailing.  As explained above, there must be an *independent* and fortuitous part of "the causal series of events leading to the injury or damage" in order to satisfy *Merced*'s definition of "accident."  *Merced*, 213 Cal. App. 3d at 50.  Yet, Plaintiffs accurately refer to Whitney National Bank's refusal to consummate the loan not as an independent and fortuitous event, but rather as a "*consequence*" of Plaintiffs' actions in "sending the Tenant Estoppel Certificate."  Plaintiffs Response to National Union MSJ at 11 (emphasis added).  Stated simply, Whitney National Bank's refusal to consummate the loan was the result of Plaintiff's action in submitting the Tenant Estoppel Certificate and not an independent and fortuitous part of "the *causal* series of events leading to the injury or damage."  *Merced*, 213 Cal. App. 3d  at 50 (emphasis added).  This *dependent* relationship is made clear in the Underlying Complaint as well: "The impact of AMPCO's interference became apparent when Whitney Bank would not close the financing without a proper SNDA certificate from AMPCO. . . .  Unfortunately, AMPCO's estoppel claim caused Aladdin to refuse to

United States District Court

For the Northern District of California

1    participate as well."  Underlying Complaint at ¶ 31.  Plaintiffs' Second Amended Complaint

2    explains the relationship consistently: IAH-JFK alleges that "AMPCO's false statements

3    directly caused Whitney National Bank to refuse to consummate the loan to IAH-JFK

4    Airport Parking" and "hurt IAH-JFK Airport Parking's opportunity to obtain financing from

5    a second source, Aladdin Developers, Inc."  SAC ¶¶ 42-43.  Although the Second Amended

6    Complaint is not relevant to the duty to defend, which focuses only on evidence available at

7    the time that the insured tenders the defense to the insurer, *CNA*, 176 Cal. App. 3d at 610,

8    the Second Amended Complaint is relevant to National Union's Motion for Summary

9    Judgment on the issue of indemnification.  In sum, because the refusal to consummate the

10   loan was not an independent, fortuitous part of "the *causal* series of events leading to the

11   injury or damage," but was instead the direct result of AMPCO's deliberate actions in

12   sending the Tenant Estoppel Certificate, the Court finds that AMPCO's actions were not an

13   accident and hence not an occurrence, within the meaning of the National Union Policy.

14        Moreover, Plaintiffs fail to establish that Whitney National Bank's actions were

15   unforeseen, as Plaintiffs claim.  Again, according to *Merced*, "An accident . . . is never

16   present when the insured performs a deliberate act unless some additional, unexpected,

17   independent, and *unforeseen* happening occurs that produces the damage."  *Merced*, 213

18   Cal. App. 3d  at 50 (emphasis added).  As noted in the Underlying Complaint, AMPCO's

19   Tenant Estoppel Certificate states that, "Tenant acknowledges that Bank is relying upon the

20   above assurances in connection with providing financing to the project and/or approving

21   Tenant's lease."  Underlying Complaint at ¶ 22 (quoting Tenant Estoppel Certificate).

22   While Plaintiffs refer to Whitney National Bank's refusal to consummate the loan as

23   "unforeseen," they fail to offer evidence in support of this assertion.  Plaintiffs' Response to

24   National Union MSJ at 11.  By contrast, the language from the Tenant Estoppel Certificate

25   quoted above would seem to indicate that AMPCO was on notice that the contents of the

26   Tenant Estoppel Certificate could bear directly on Whitney National Bank's financing

27

28

1   decision.  Ultimately, Plaintiffs' claim that this action was "unforeseen" is a conclusory

2   statement, and conclusory, speculative testimony is insufficient to raise genuine issues of

3   fact and defeat summary judgment.  *Falls Riverway Realty, Inc. v. City of Niagara Falls*,

4   754 F.2d 49, 57 (2d Cir.1985); *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738

5   (9th Cir.1979).

6          Second, and in the alternative, Plaintiffs argue that their actions were accidental and

7   hence constituted an "occurrence" because, according to the Underlying Complaint, the

8   Tenant Estoppel Certificate contained "accidental and negligent false statements."

9   Plaintiffs' Response to National Union MSJ at 10-11.  In Plaintiffs' Motion for Partial

10  Summary Judgment, Plaintiffs elaborate, arguing that "[a] cursory review of the Underlying

11  Complaint reveals that the Underlying Plaintiff repeatedly states that the position taken by

12  AMPCO concerning merger of the lease and contract was potentially negligently

13  erroneous."  Plaintiffs' MSJ at 12-13 (citing Underlying Complaint at ¶¶ 33-37, 40).   For

14  example, Plaintiffs point to allegations in the Underlying Complaint that "AMPCO's

15  counsel knew or should have known assertions he made to be false."  *Id.* at 13.  Plaintiffs'

16  argument is unavailing.  "Under California law, the term [accident] refers to the nature of

17  the insured's conduct, not his state of mind." *Collin v. American Empire Ins. Co.*, 21 Cal.

18  App. 4th 787, 804 (Cal. Ct. App. 1994).  That AMPCO may have negligently or erroneously

19  adopted the positions stated in the Tenant Estoppel Certificate is irrelevant in determining

20  whether an accident—and hence an occurrence—transpired:

> Nor is it an "accident" in common speech when an employer intentionally
> fires a worker, or a landlord evicts a tenant, whether or not the actor
> believes himself entitled to do so. . . .  We know of no case from this or any
> other jurisdiction where a harm knowingly and purposefully inflicted was
> held "accidental" merely because the person inflicting it erroneously
> believed himself entitled to do so. We decline plaintiffs' implicit invitation
> to expand the scope of liability for an "occurrence" to such an uncertain but
> presumably dramatic extent. The only question before [the insurer] was
> whether plaintiffs intentionally caused the termination of the Chins' tenancy.

26  *Swain v. California Casualty Ins. Co.*, 99 Cal. App. 4th 1, 9-10 (Cal. Ct. App. 2002)

27

28

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

1  (intentional tenant eviction was not an "accident"—and hence not an occurrence within the

2  meaning of the insurance policy—even if insured mistakenly believed the eviction was

3  legally proper).  Just as the Court in *Swain* focused on whether the plaintiffs intentionally

4  caused the termination of tenancy—ignoring plaintiffs' beliefs about the merits of their

5  actions—here the Court must focus on whether Plaintiffs intentionally drafted the

6  statements in the Tenant Estoppel Certificate and intentionally submitted the Certificate to

7  Whitney National Bank, ignoring allegations of whether the Certificate contained

8  negligently or accidentally erroneous allegations.  As noted above, both the Underlying

9  Complaint and the Second Amended Complaint indicate that Plaintiffs intentionally drafted

10  and submitted the Tenant Estoppel Certificate.  Underlying Complaint at ¶ 22; SAC at ¶ 39.

11  Plaintiffs fail to argue otherwise.

12       While Plaintiffs cite cases asserting that negligence can constitute an accident under

13  certain circumstances, these cases do not advance Plaintiffs' argument.  In *Anthem*, a case

14  pre-dating *Swain*, the Ninth Circuit found the possibility of an accident, and hence an

15  occurrence, where the insured may have manufactured defective products through faulty

16  workmanship, without knowledge that it was doing so.  *Anthem Electronics, Inc., v. Pacific*

17  *Employers Ins. Co.*, 302 F.3d 1049, 1055-56 (9th Cir. 2002).  The Ninth Circuit held,

18  "Though the complaint said nothing affirmative about the defects being accidental, neither

19  did it provide a reason to think that they were expected.  The possibility that the defects

20  were unexpected is enough to trigger the insurers' duty to defend even though the complaint

21  failed to allege an accident."  *Id.* at 1056.  The instant case is readily distinguishable.  In

22  *Anthem*, the manufacturer did not expect that its products would contain the defects in

23  question.  *Id.*  This was central the Court's finding that the defects were accidental.  *Id.* In

24  the instant case, Plaintiffs do not argue that they drafted the Tenant Estoppel Certificate

25  without knowledge that the Tenant Estoppel Certificate contained the statements regarding

26  the merger of the lease.  According to both the Underlying Complaint and Plaintiffs' Second

27

28

Amended Complaint, Plaintiffs expected and intended the Tenant Estoppel Certificate to contain the statements regarding the merger.  Underlying Complaint at ¶ 22 ("AMPCO sent a 'Tenant Estoppel Certificate' to Whitney National Bank" and, within it, "AMPCO *raised* an entirely new claim" regarding the Budget Lease. (emphasis added)); SAC at ¶ 39 ("AMPCO sent a 'Tenant Estoppel Certificate' to Whitney National Bank," and, within that Certificate, "AMPCO *alleged* that the fee simple and leasehold interests of the Budget Parcel merged . . . ." (emphasis added)).  Rather, Plaintiffs argue that, according to the Underlying Complaint, they "should have known" that the statements that they made were false.  Plaintiffs' Response to National Union MSJ at 11.  Mistaken beliefs regarding the propriety of certain actions fall squarely under the holding of the California Court of Appeals in *Swain*, discussed above.

Plaintiffs cite to other cases in order to show that occurrences may arise from negligence.  However, these cases simply assume that the activities in question were an occurrence, without explaining how or why.  *See, e.g., Borg v. Transamerica Ins. Co.*, 47 Cal. App. 4th 448 (Cal. Ct. App. 1996) (negligent encroachment and trespass on the property of another was an occurrence); *American Empire Surplus Lines Ins. Co., v. G.E. Leach Construction Co.*, 223 Cal. App. 3d 226 (Cal. Ct. App. 1990) (same).  These cases do not advance Plaintiffs' position.  "It is a well-established rule that an opinion is only authority for those issues actually considered or decided."  *Rosen v. State Farm General Ins. Co.*, 30 Cal. 4th 1070, 1077 (Cal. 2003).  Had these cases actually addressed the occurrence analysis, they might well have stood for the same proposition as *Anthem*: unexpected actions, such as trespass on the property of another, can be considered accidents.

### 3.       Conclusion Regarding Property Damage

As noted above, the California state law regarding the duty to defend is as follows: "An insurer must defend its insured against claims that create a *potential* for indemnity under the policy."  *Scottsdale Ins. Co. v. MV Transportation*, 36 Cal.4th 643, 654 (Cal.

27

2005) (emphasis in original). The duty to defend "must be determined from the facts and inferences known to an insurer from the pleadings, available information and its own investigations at the time of the tender of defense." *CNA Casualty of California v. Seaboard Surety Co.*, 176 Cal. App. 3d 598, 610 (Cal. Ct. App. 1986) (citation omitted). According to the evidence available at the time that the Underlying Action was tendered to National Union—that is, the Underlying Complaint[2]—the allegations in the Underlying Action cannot possibly satisfy the definitions of property damage or occurrence, within the meaning of the National Union Policy. The Court concludes that there was no basis for "potential coverage" of the Underlying Action. *Montrose*, 6 Cal. 4th at 655. Thus, the Court GRANTS National Union's Motion for Summary Judgment, to the extent that it pertains to a duty to defend under the property damage clause of the National Union Policy. Similarly, the Court DENIES Plaintiffs' Motion for Partial Summary Judgment to the extent that it pertains to a duty to defend under the property damage clause of the National Union Policy. Because Plaintiffs fail to bear their burden of "establish[ing] that the occurrence forming the basis of its claim is within the basic scope of insurance coverage," *Aydin*, 18 Cal. 4th at 1188, the Court also GRANTS National Union's Motion for Summary Judgment to the extent that it pertains to indemnification under the property damage clause of the National Union Policy. *See also Anthem*, 302 F.3d at 1054, n. 2 ("Because the duty to defend is broader than the duty to indemnify, summary judgment for the insurers on the former necessarily includes the latter.")

### D.    Personal Injury

Plaintiffs seek partial summary judgment, in part, on the proposition that National Union owes a duty to defend to Plaintiffs for injuries in the Underlying Action that are

---

[2] While Plaintiffs state that a "thorough investigation would have established ample factual and legal bases for insurance coverage," Plaintiffs MSJ at 9 n. 2, Plaintiffs fail to supplement this conclusory statement by identifying the extrinsic evidence of which National Union should have been aware at the time of tender.

28

1   potentially covered under the National Union Policy's personal injury clause.

2        National Union, by contrast, seeks summary judgment on the proposition that

3   National Union does not owe Plaintiffs indemnification or a duty to defend under the

4   personal injury clause.

5                    **1.      The Personal Injury Clause**

6        The National Union Policy provides indemnification and legal defense for "personal

7   injury."  The National Union Policy defines "personal injury" as

> injury other than Bodily Injury or Advertising Injury arising out of one or
> more of the following offenses . . .
> 3.   The wrongful eviction from, wrongful entry into, or invasion of the
>      right of private occupancy of a room, dwelling or premises that a
>      person occupies by or on behalf of its owner, landlord or lessor;
> 4.   Oral or written publication of material that slanders or libels a
>      person or organization or disparages a person's or organization's
>      goods, products or services;

National Union MSJ, Ex. 5, at 1, 5, 6 (National Union Policy).

                     **2.      Interpreting the Personal Injury Clause**

         "In the world of liability insurance, personal injury coverage applies to injury which

arises out of the commission of certain enumerated acts or offenses." *Fibreboard Corp v.*

*Hartford Accident and Indemnity Co.*, 16 Cal. App. 4th 492, 511 (Cal. Ct. App. 1993).  To

the extent the policy's listed offenses are framed in generic terms," "and not separately

defined in the policies," "they should be construed broadly to encompass all specific torts

which reasonably could fall within the general category." *Id.* at 512, 515.  Where the

policies framed the listed offenses in generic terms, the Court "give[s] [the listed offenses]

meaning by reference to their common law elements." *Id.*  "[P]ersonal injury coverage is

not determined by the nature of the damages sought in the action against the insured, but by

the nature of the claims made against the insured in [the underlying] action." *Martin*

*Marietta Corp. v. Ins. Company of North America*, 40 Cal. App. 4th 1113, 1125 (Cal. Ct.

App. 1995).  However, contrary to National Union's assertion, this does not mean that the

duty to defend arises only when a covered claim is pleaded in the Underlying Complaint.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

National Union MSJ at 16.  To the contrary, in the context of personal injury coverage, the California Court of Appeals has held that "the duty to defend arises when the facts alleged in the underlying complaint give rise to a potentially covered claim regardless of the technical legal cause of action pleaded by the third party. *Barnett v. Fireman's Fund Ins. Co.*, 90 Cal. App. 4th 500, 510 (Cal. Ct. App. 2001).  As both National Union and Plaintiffs acknowledge, under California law, because the analysis turns on "the nature of the claims made against the insured in [the underlying] action," *Martin Marietta*, 40 Cal. App. 4th at 1125, this Court must examine the tort law of Texas to determine whether the facts alleged in the Underlying Complaint give rise to potentially covered claims.  National Union MSJ at 16; Plaintiffs' MSJ at 10 n. 3.  California state law is still being used to interpret the language of the insurance policy, but the "common law elements" used to define the offenses listed in the insurance policy must come from Texas tort law.  For example, in *Fibreboard*, the California Court of Appeals examined the torts alleged against plaintiff in the underlying complaints, interpreting them based on the laws of the various states in which the underlying complaints had been filed, to hold that these torts would not "fall within the ambit of the invasion of privacy torts." *Fibreboard*, 16 Cal. App. 4th at 515-16. However, the Court of Appeals referred to California case law to define the terms used in the insurance policy.  *Id.* at 503-504, 506-507.

Finally, because the burden is on the insured "to establish that the occurrence forming the basis of its claim is within the basic scope of insurance coverage" and to "prove the existence of a potential for coverage," the burden is on the insured to identify a specific tort which could be "alleged against it" "which would fall within the ambit of the" offenses listed in the policy. *Aydin*, 18 Cal. 4th at 1188; *Montrose*, 6 Cal. 4th at 300; *Fibreboard*, 16 Cal. App. 4th at 515.

### 3.   Wrongful Eviction, Wrongful Entry, Invasion of the Right of Private Occupancy

As noted above, the National Union Policy includes the following as one offense

30

that would satisfy the definition of personal injury: "The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor."  National Union MSJ, Ex. 5, at 5-6 (National Union Policy).

Plaintiffs argue that the facts in the Underlying Action make out a tort—covered by the National Union Policy—for "wrongful eviction from or invasion of the right of private occupancy of real property."  Specifically, Plaintiffs argue that in the Underlying Complaint, Underlying Plaintiff claimed to have suffered the forced sale of real property—Underlying Plaintiff's share of the 26.25 acre parcel of property—because of AMPCO's actions in drafting and submitting the Tenant Estoppel Certificate.  Underlying Complaint at ¶ 40.

The Court need not address the specific torts available on the facts of the Underlying Action, because, as National Union argues, Plaintiffs' argument fails as a matter of insurance policy interpretation.  As noted above, the Court interprets the language of the policy pursuant to California state law.  *Fibreboard*, 16 Cal. App. 4th at 503-504, 506-507.

In *Mirpad*, the California Court of Appeals interpreted the following language to apply only to underlying claims by natural persons and not by corporations or other legal entities: "wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of: (a) a room; (b) a dwelling; or (c) premises; that a person occupies by or on behalf of its owner, landlord or lessor." *Mirpad v. California Ins. Guarantee Ass'n*, 132 Cal. App.4th 1058, 1064 (Cal. Ct. App.2005).  This is the precise language used in the National Union policy.  National Union MSJ, Ex. 5, at 5 (quoted above).  The California Court of Appeals based its holding on the fact that the insurance policy in *Mirpad* elsewhere distinguished between "persons" and "organizations."  *Id.* at 1070-73.  The court in *Mirpad* explained that "Words used in a certain sense in one part of an instrument are deemed to have been used in the same sense in another." *Id.* at 1069.  If "'person' is interpreted to

include organizations, the word 'organization' in the oft-repeated phrase 'person or organization' becomes redundant and surplusage.  This is contrary to well established rules of construction.  It is a very fundamental principle that policy language be so construed as to give effect to every term."  *Id.* at 1072.  The policy in *Mirpad* contained the following as one of five offenses—including the wrongful eviction offense—that would satisfy the definition of "personal injury": "oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services."  *Id.* at 1064.  The California Court of Appeals explained:

> The problem created by construing the terms "person" and "organization" as interchangeable is no more evident than in the clause relating to the offense of libel or slander *that is part of the policy definition of "Personal Injury."* If the word "organization" is redundant and therefore unnecessary, then the offense of libel and slander is effectively re-written to read: "oral or written publication of material that slanders or libels a person or disparages a person's goods, products or services." To do so, however, creates an ambiguity as to whether the policy covers commercial slander as well as personal libel and slander. These are different offenses. As written, the policy clearly covers both offenses. An interpretation of the policy that creates an ambiguity where none existed by rendering words redundant or superfluous violates all rules of construction.

*Id.* at 1073 (emphasis in original).

Just like the policy in *Mirpad*, the National Union policy refers separately, throughout the policy, to "person" and "organization" and repeatedly uses the phrase "person or organization."  National Union MSJ, Ex. 5, at 3, 4, 6 (National Union Policy).  In fact, just like the policy in *Mirpad*, the National Union Policy lists the following as one of five offenses—including wrongful eviction—that would satisfy the definition of "personal injury": "Oral or written publication of material that slanders or libels a person or organization or disparages a *person's or organization's* goods, products or services."  *Id.* at 6 (emphasis added).  For all of the reasons discussed in *Mirpad*, the term "person"—as used in the Personal Injury definition clause, and throughout the policy—must refer to a "natural person."  In *Mirpad*, the court held that because the term "person" referred to a "natural person," the insurance policy did not cover eviction of the party in the underlying action, a

1    corporation.  For the same reasons as stated in *Mirpad*, and contrary to Plaintiffs' arguments,

2    the National Union policy does not provide a duty to defend or indemnification for the

3    alleged "wrongful eviction from or invasion of the right of private occupancy of real

4    property" of the Underlying Plaintiff, a corporation.  *See* Underlying Complaint ¶ 2

5    (defining Underlying Plaintiff as a corporation).

6         Thus, no tort may be stated on the facts alleged in the Underlying Action that would

7    give rise to coverage under the "wrongful eviction from or invasion of the right of private

8    occupancy of real property" provision of the National Union policy.

9                          **4.    Libel and Slander**

10        As noted above, the National Union Policy includes the following as one offense

11   that would satisfy the definition of personal injury: "Oral or written publication of material

12   that slanders or libels a person or organization or disparages a person's or organization's

13   goods, products or services."  National Union MSJ, Ex. 5, at 6 (National Union Policy).

14        Plaintiffs argue that the facts alleged in Underlying Action could potentially make

15   out tort claims covered by the National Union Policy for libel or slander.  Specifically,

16   Plaintiffs argue that "the Tenant Estoppel Certificate is a written publication that allegedly

17   slandered or libeled [Underlying Plaintiff]."  Plaintiffs Response to National Union MSJ at

18   13.

19        To begin, Plaintiff's claims regarding slander are facially erroneous.  As Plaintiffs

20   acknowledge, the Tenant Estoppel Certificate is "written."  Thus, it cannot satisfy the

21   definition of slander: "Slander is a defamatory statement that is *orally* communicated or

22   published to a third person without legal excuse."  *Randall's Food Mkts. v. Johnson*, 891

23   S.W.2d 640, 646 (Tex. 1995) (emphasis added).

24        Regarding libel, under Texas law, a corporation may be libeled.  *Brown v. Petrolite*

25   *Corp.*, 965 F.2d 38, 43 n.5 (5th Cir. 1992).  Texas law defines libel as:

26        [A] defamation expressed in written or other graphic form that tends to ...
          injure a living person's reputation and thereby expose the person to public
27

28                                          33

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

hatred, contempt or ridicule, or financial injury or to impeach a person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury.

*Id.* (quoting Tex.Prac. & Rem. Code § 73.001).

According to Plaintiffs, "Underlying Plaintiff claimed that AMPCO published material that harmed its reputation by making a false statement as to merger to a third party (Whitney National Bank) that caused damages to the Underlying Plaintiff's business." Plaintiffs' Response to National Union MSJ at 13.  Plaintiffs explain further, "The false statement harmed [Underlying Plaintiff's] reputation by implying that it would be unable to repay a loan, and it caused damage because [Underlying Plaintiff] was forced to sell its share of the 26.25 acre parcel of property."  *Id.*  Plaintiffs misconstrue the term "reputation." While the Texas courts have not defined the term "reputation," pursuant to Texas law, "[w]ords and phrases [in statutes] shall be read in context and construed according to the rules of grammar and common usage," and "[d]ictionary definitions can be utilized by courts" for this purpose.  *Morgan Buildings and Spas, Inc. v. Turn-Key Leasing, Ltd.*, 97 S.W.3d 871, 880 n. 16 (Tex. Ct. App. 2003) (quoting Tex. Gov't. Code Ann. § 311.011). Dictionaries define "reputation" as "[t]he esteem in which a person is held by others." BLACK'S LAW DICTIONARY 1307 (7th ed. 1999).  For example, in *Brown*, the Fifth Circuit affirmed a jury verdict of libel, finding damage to reputation caused by a report that claimed that a company's products—designed to purge paraffin from oil wells—"did not work," "caused corrosion, and were likely to result in extensive damage to [oil] wells and equipment."  *Brown*, 965 F.2d at 41-42, 46.  Contrary to Plaintiffs' assertions, there are no allegations in the Underlying Complaint that suggest harm to the esteem in which Underlying Plaintiff was held by others.  The Underlying Complaint quotes the Tenant Estoppel Certificate as follows: "the terms and conditions of the Budget Lease [are] null and void, and as such, no monthly rental payments would be due."  Underlying Complaint at ¶ 26.  According to the Underlying Complaint, the Tenant Estoppel Certificate affected

34

United States District Court

For the Northern District of California

revenue projections for the proposed buy-out of the 26.25 acre property; this change in projected revenue deterred Whitney National Bank and Aladdin Developers from financing the Underlying Plaintiff's buy-out.  Underlying Complaint at ¶¶ 28, 31.  A letter from Aladdin Developers quoted in the Underlying Complaint stated, "the conditional estoppel letter from AMPCO further creates a substantial impact on the projections making the investment undesirable."  *Id.* at ¶ 31.  The decisions by Whitney National Bank and Aladdin Developers not to finance Underlying Plaintiff were based purely on the financial expectations surrounding the Underlying Plaintiff's proposed buy-out of the 26.25 acre tract of property—the "desirab[ility]" of the "investment"—according to the Underlying Complaint.  *Id.*   There is no suggestion in the Underlying Complaint that these decisions were based on the esteem with which Whitney National Bank or Aladdin Developers viewed Underlying Plaintiff.   If anything, the Underlying Complaint suggests that these decisions were not based on reputation.  The letter from Aladdin Developers quoted in the Underlying Complaint explained that a representative of Aladdin Developers "attempted to negotiate with AMPCO regarding the conditions set forth but has been unsuccessful."  *Id.*  If Underlying Plaintiff's prospective business partner no longer held Underlying Plaintiff in high esteem, as a result of the Tenant Estoppel Certificate—as Plaintiffs argue—it is unlikely that the prospective partner would have attempted to negotiate with AMPCO in the interest of salvaging its proposed deal with Underlying Plaintiff.  In sum, the Underlying Complaint presents no allegations pertaining to harm to Underlying Plaintiff's *reputation*.  Thus, the tort of libel will not lie.

### 5.   Disparagement

As noted above, the National Union Policy includes the following as one offense that would satisfy the definition of personal injury: "Oral or written publication of material that . . . disparages a person's or organization's goods, products or services."  National Union MSJ, Ex. 5, at 6 (National Union Policy).

Plaintiffs unsuccessfully argue that the Underlying Complaint potentially makes out a tort claim for disparaging the Underlying Plaintiff's goods, products, or services. The Court need not address the specific torts available on the facts of the Underlying Action, because Plaintiffs' argument fails as a matter of insurance policy interpretation. As noted above, the Court interprets the language of the policy pursuant to California state law. *Fibreboard*, 16 Cal. App. 4th at 503-504, 506-507.

In the instant case, regardless of the nature or number of torts that could constitute "disparage[ment]," AMPCO's statements in the Tenant Estoppel Certificate did not "disparage" any "*good*," "*product*," or "*service*" provided by the Underlying Plaintiff. National Union MSJ, Ex. 5, at 6 (National Union Policy) (emphasis added). The Tenant Estoppel Certificate merely spoke to the validity of a lease owed to the Underlying Plaintiff. As National Union argues, a lease is a "contract"—it is not a "good," "product," or "service" provided by the Underlying Plaintiff. National Union Reply for National Union MSJ at 9. Plaintiffs fail to prove otherwise.

Under California law, terms used in insurance policies that are not used in a technical or special sense should be given their ordinary and popular meanings. *Modern Development Co. v. Navigators Ins. Co.*, 111 Cal. App. 4th 932, 938-39 (Cal. Ct. App. 2003) (citing *Safeco Ins. Co. v. Robert S.*, 26 Cal.4th 758, 763 (Cal. 2001); *Palmer v. Truck Ins. Exchange,* 21 Cal.4th 1109, 1115 (Cal. 1999); *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 821-822 (Cal. 1990)). Courts may examine dictionary definitions in determining the "ordinary and popular sense of words in an insurance policy," so long as doing so will not disregard the context of the insurance policy. *MacKinnon v. Truck Ins. Exchange*, 31 Cal.4th 635, 649, 650-52 (Cal. 2003). Dictionaries define a service as "useful labor that does not produce a tangible commodity," WEBSTER'S COLLEGIATE DICTIONARY 1137 (11th ed.2003), "the act of doing something useful for a person or company for a fee" and "[a]n intangible commodity in the form of human effort, such as labor, skill, or advice,"

BLACK'S LAW DICTIONARY 1372 (17th ed. 1999).  A lease contract does not constitute "labor," "effort," or "doing something useful" for a fee.  Dictionaries define "good" as "something manufactured or produced for sale," WEBSTER'S COLLEGIATE DICTIONARY 539 (11th ed.2003), and "tangible or movable personal property other than money" BLACK'S LAW DICTIONARY 701 (17th ed. 1999).  A lease contract does not constitute something tangible or manufactured.  Dictionaries define "product" as "something produced" or "something . . . that is marketed or sold as a commodity," WEBSTER'S COLLEGIATE DICTIONARY 991 (11th ed.2003), or "tangible personal property," BLACK'S LAW DICTIONARY 1225 (17th ed. 1999).   A lease contract does not constitute "tangible personal property" or something "produced" or a commodity that is "marketed or sold."  Therefore, as a matter of insurance policy interpretation, disparagement of a lease contract could not constitute disparagement of a *good*, *product*, or *service*—regardless of the number or nature of torts available within the category of "disparagement."

Plaintiffs only cite one case from *Colorado* in support of their argument that a lease can be a service—*Thompson v. Maryland Casualty Company*, 84 P.3d 496 (Colo. 2004).  *Thompson* is inapplicable.  The insurance policy in *Thompson* mirrored the ones in the instant matter, providing coverage for "disparage[ment] [of] a person's or organization's goods, products, or services."  *Id.* at 499.  The court in *Thompson* applied the dictionary definitions of service stated above to find that "Platting, financing, developing, and selling of real property" are services because they "involve human labor and skill and do not produce a tangible commodity distinct from the real property itself."  *Id.* at 507.   In *Thompson,* a letter made to a potential purchaser of real property was held to be "derogatory to [the underlying plaintiff's] [services] because it interfered with the platting, financing, development, and sale of its property" by claiming, in effect, that the underlying plaintiff would be unable to sell the property in question due to the insured's right of first refusal.  *Id.* at 500, 507, 508.  Stated simply, in *Thompson*, the insured disparaged the underlying

United States District Court

For the Northern District of California

1  plaintiff's services by claiming that the underlying plaintiff could not deliver services—the

2  sale of its property—that the underlying plaintiff was in the business of providing.  Here, by

3  contrast, AMPCO's statements were about the terms of a lease contract and not about the

4  quality, nature, or availability of any services—or, for that matter, goods or

5  products—provided by the Underlying Plaintiff.  As Zurich argued, while still a party to this

6  motion, "even if AMPCO's statements interfered with [Underlying Plaintiff's] business as a

7  landlord, there is no possible construction whereby it could be found that AMPCO

8  'disparaged' [Underlying Plaintiff's] 'services.'" Zurich Motion for Summary Judgment at 24.

9

10      Plaintiffs argue that a number of torts could fall within the general category of

11  "disparage[ment] [of] a person's or organization's goods, products or services."  National

12  Union MSJ, Ex. 5, at 6 (National Union Policy).  Again, these arguments are in vain, as

13  Plaintiffs fail to explain how, in the instant case, under any of these torts, Plaintiffs actually

14  disparaged Underlying Plaintiff's *goods*, *products*, or *services*.

15      Two of the cases cited by Plaintiffs to identify specific torts that would fall under the

16  category of disparagement of goods, products, or services actually involved disparagement

17  of products or services—unlike the instant case.

18      In *J. Lamb*, "the [underlying plaintiff] alleged that [the insured] had falsely stated to

19  [the underlying plaintiff's] customers that [the underlying plaintiff's] products were

20  burdened with a prior legal right and [customers'] purchase of such products would subject

21  them to litigation."  *Atlantic Mutual Ins. Co. v. J. Lamb, Inc.*, 100 Cal. App. 4th 1017,

22  1034-35 (Cal. Ct. App. 2002).  Thus, the statements actually pertained to the underlying

23  plaintiff's products and were made to influence prospective customers not to buy.  However,

24  Plaintiffs fail to demonstrate that Underlying Plaintiff's products were disparaged in the

25  instant case.

26      Similarly, *Cincinnati Ins. Co. v. Eastern Atlantic Ins. Co.*, 260 F.3d 742 (7th Cir.

27

28                                    38

United States District Court

For the Northern District of California

2001), involved disparagement of an underlying plaintiff's services, where the insured told customers of the underlying plaintiff that the underlying plaintiff was "engaged in activities that might trigger liability" for customers of the underlying plaintiff.  However, Plaintiffs fail to demonstrate that Underlying Plaintiff's services were disparaged in the instant case.

Other cases cited by Plaintiffs are irrelevant, as they fail to discuss disparagement of goods, products, or services, as is required by the terms of the National Union Policy.

For example, Plaintiffs cite *Bankwest v. Fidelity & Deposit Co. of Maryland*, 63 F.3d 974, 977 (10th Cir. 1995), for the proposition that tortious interference with contract is covered under the disparagement clause of the National Union Policy.  Plaintiffs' MSJ at 18. However, *Bankwest* involved an insurance policy with different terms than the National Union Policy.  The policy in *Bankwest* provided insurance for "the publication or utterance of a libel or slander or of other defamatory or *disparaging material*."  *Bankwest*, 63 F.3d at 977 (emphasis added).  Unlike the National Union Policy, the *Bankwest* policy did *not* require that the disparagement be directed at "a person's or organization's *goods*, *products* or *services*" in order to qualify for insurance coverage.  National Union MSJ, Ex. 5, at 6 (National Union Policy) (emphasis added).  In *Bankwest*, the Tenth Circuit reviewed a bank president's actions in sending "letters to [two] . . . banks stating that both banks were 'estopped from making any future advancements' to the underlying plaintiffs."  *Id.* at 976. The Tenth Circuit held that this "assertion of the limitations on the Colorado banks' lending authority" satisfied the terms of the insurance policy because it "interfered with [the underlying plaintiffs'] contractual and business relations."  *Id.* at 980-81.  The Tenth Circuit's analysis is irrelevant to the National Union Policy because a) the policy in *Bankwest* was not restricted to disparagement directed at goods, products, or services, and b) the Tenth Circuit thus did not address—the critical inquiry in this case—whether the underlying plaintiffs' goods, products, or services were disparaged.  In sum, *Bankwest* does not aid Plaintiffs in demonstrating that the Plaintiffs' actions involved disparagement of an

United States District Court

For the Northern District of California

1    Underlying Plaintiff's goods, products, or services.

2         Similarly, Plaintiffs cite two cases from the Texas Supreme Court for the proposition

3    that the tort of business disparagement is covered under the disparagement clause of the

4    National Union Policy.  Plaintiffs' Response to National Union MSJ at 15-16.  In *Forbes*,

5    the Texas Supreme Court defined the tort of business disparagement as involving the

6    following four elements: "(1) the defendant published false and disparaging information

7    about [the plaintiff], (2) with malice, (3) without privilege, (4) that resulted in special

8    damages to the plaintiff."  *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W3d 167, 170

9    (Tex. 2003).  The Texas Supreme Court held that this standard was not satisfied where a

10   magazine article contained negative, allegedly false statements about a company—including

11   a false statement that a particular investor was suing the company—because the record

12   contained no evidence that the magazine published the false statements with actual malice.

13   *Id.* at 176.  In *Hurlburt*, the Texas Supreme Court explained that the tort of business

14   disparagement applied "in cases of the disparagement of property in land, chattels, or

15   intangible things or of their quality." *Hurlburt v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762

16   (Tex. 1987).  In *Hurlburt*, the Texas Supreme Court held that two insurance agents did not

17   satisfy the standard of business disparagement, where they claimed that their former

18   employer denied that it was underwriting the insurance policies that they were selling,

19   because the agents failed to prove special damages.  *Id.* at 767.  Neither *Forbes* nor

20   *Hurlburt* involved the interpretation of insurance policies.  Again, even assuming that the

21   tort of business disparagement is covered under the disparagement clause of the National

22   Union Policy, Plaintiffs' description of this tort is irrelevant, as Plaintiffs fail to show that

23   the alleged business disparagement in the instant case involved Underlying Plaintiff's *goods*,

24   *products*, or *services*.

25        Finally, Plaintiffs argue that the tort of slander of title is covered under the

26   disparagement clause of the National Union Policy.  Plaintiffs' Response to National Union

27

28                                              40

MSJ at 16-17.  Under Texas law,

> To recover in an action for slander of title, a party must allege and prove: 1) the utterings and publishing of disparaging words; 2) that they were false; 3) that they were malicious; 4) that special damages were sustained thereby; 5) that the plaintiff possessed an estate or interest in the property disparaged; and 6) the loss of a specific sale.

*Williams v. Jennings*, 755 S.W.2d 874, 879 (Tex. Ct. App. 1998).  The tort applies only where special damage is caused to *real property*. *Santa Fe Energy Operating Partners, L.P. v. Carrillo*, 948 S.W.2d 780, 785 (Tex. Ct. App. 1997).  Once again, Plaintiffs' description of the tort of slander of title is irrelevant, as Plaintiffs fail to show how this could constitute disparagement of Plaintiff's goods, products, or services, as those terms are defined under California law.  As noted above, under California law, Courts may examine dictionary definitions in interpreting the meaning of words in an insurance policy, so long as doing so will not disregard the context of the insurance policy. *MacKinnon v. Truck Ins. Exchange*, 31 Cal.4th 635, 649, 650-52 (Cal. 2003).  Title to real property is not a good, product, or service.  By reference to the dictionary definitions cited above, real property is not "labor," "effort," "doing something useful" for a fee, "useful labor," "personal property," or an "act," and it is not "manufactured or produced for sale" or "marketed or sold as a commodity." WEBSTER'S COLLEGIATE DICTIONARY 539, 991, 1137 (11TH ED.2003); BLACK'S LAW DICTIONARY 701, 1225, 1372 (17TH ED. 1999).  BLACK'S LAW DICTIONARY explicitly distinguishes between real and personal property, defining "real property" as "[l]and and anything growing on, attached to, or erected on it, excluding anything that may be served without injury to the land" and defining "personal property" as "[a]ny movable or intangible thing that is subject to ownership and not classified as real property." BLACK'S LAW DICTIONARY 1233-34 (17th ed. 1999).

As an aside, two cases—constituting persuasive authority—confirm the conclusion that slander of title torts are not covered under the National Union Policy.  In *Kickham Group v. American Nat'l Fire Ins. Co.*, 1997 WL 600710, at *2-*3 (N.D. Tex. 1997), a case

41

involving the Texas tort of slander of title, the court reviewed the dictionary definitions of "good," "product," and "service" to determine that title to real property did not fall within these categories. The court thus held that damages based on the tort of slander of title are not available under a policy which covers "disparage[ment] [of] a person's or organization's goods, products or services." *Id.* Similarly, in *Bank One, Milwaukee, N.A. v. Breakers Development, Inc.*, 208 Wis.2d 230, 231-35 (Wis. Ct. App. 1997), the Wisconsin Court of Appeals reviewed dictionary definitions to determine that title to real property did not fall into the categories of a good or product. The court thus held that damages based on the tort of slander of title are not available under a policy which covers "disparage[ment] [of] a person's or organization's goods, products or services." *Id.*

Pursuant to its plain and ordinary meaning, the National Union Policy covers disparagement of an organization's *goods, products, or services*. As a matter of insurance policy interpretation, Plaintiffs are unable to make out torts on the alleged facts of the Underlying Action that fall into this generic category.

### 6.      Conclusion regarding Personal Injury

The duty to defend "must be determined from the facts and inferences known to an insurer from the pleadings, available information and its own investigations at the time of the tender of defense." *CNA Casualty of California v. Seaboard Surety Co.*, 176 Cal. App. 3d 598, 610 (Cal. Ct. App. 1986) (citation omitted). According to the evidence available at the time that the Underlying Action was tendered to National Union—i.e., the Underlying Complaint—the allegations in the Underlying Action cannot possibly satisfy the National Union Policy's definition of personal injury. There was no basis for "potential coverage" of the Underlying Action under the personal injury clause. *Montrose*, 6 Cal. 4th at 655. Thus, the Court GRANTS National Union's Motion for Summary Judgment, to the extent that it pertains to a duty to defend for personal injury claims. Similarly, the Court DENIES Plaintiffs' Motion for Partial Summary Judgment to the extent that it pertains to a duty to

42

1    defend for personal injury claims.  Because Plaintiffs fail to bear their burden of

2    "establish[ing] that . . . its claim is within the basic scope of insurance coverage," *Aydin*, 18

3    Cal. 4th at 1188, the Court also GRANTS National Union's Motion for Summary Judgment

4    to the extent that it pertains to indemnification for personal injury claims. *See also Anthem*,

5    302 F.3d at 1054, n. 2.

6         **E.      Exclusions**

7         Even if Plaintiffs' claims fell within the National Union Policy, National Union

8    argues that many of Plaintiffs' claims are precluded by exclusions in the National Union

9    Policy.  "[T]he burden is on the insurer to prove the claim is specifically excluded." *Aydin*,

10   18 Cal. 4th at 1188.

11        **1.      Exclusion for Property you Own, Rent, or Occupy**

12        First, National Union argues that any claims for property damage in the Underlying

13   Action are expressly barred by the "property you own, rent, or occupy exclusion."

14   Specifically, the National Union Policy states, "This insurance does not apply to . . .

15   Property Damage to: 1) Property you own, rent, occupy or use; 2) Personal property in the

16   care, custody or control of the Insured."   National Union MSJ, Ex. 5, at 3 (National Union

17   Policy).  The First Circuit has held that an exclusion for damage to property "you own, rent,

18   or occupy" is unambiguous and applies to leased property. *Wyner v. North Am. Specialty

19   Ins. Co.*, 78 F.3d 752 (1st Cir. 1996).  National Union argues that because it is undisputed

20   that AMPCO leased and occupied the property Underlying Plaintiff was trying to purchase,

21   any alleged property damage to that property is expressly excluded from coverage.  National

22   Union MSJ at 19; Underlying Complaint at ¶ 13.

23        In response, Plaintiffs assert that the property damage befell a third party (the

24   Underlying Plaintiff), and the exclusion does not bar coverage for liability on account of

25   property damage.  Plaintiffs cite no authorities for this assertion, and as National Union

26   argues, Plaintiffs' argument is unavailing.  Plaintiffs' Response to National Union MSJ at

27

28
                                         43

18.  As National Union observes, the National Union Policy is a third-party liability policy specifically designed to cover—and exclude in certain cases—certain third-party liability risks.  National Union Reply at 12.  For these reasons, the Court GRANTS National Union's Motion for Summary Judgment to the extent that the exclusion for "property you own, rent, or occupy" bars a duty to defend and indemnification on Plaintiffs' property damage claims.

## 2.      Exclusion for Impaired Property

Second, National Union argues that claims for property damage are barred by the impaired property exclusion.  Impaired property is defined in the insurance policy as "tangible property" "that cannot be used or is less useful because . . .  You have failed to fulfill the terms of a contract or agreement; if such property can be restored to use by . . . Your fulfilling the terms of the contract or agreement."  National Union MSJ, Ex. 5, at 3 (National Union Policy).  Under the impaired property exclusion, the National Union Policy does not apply to "Property Damage to Impaired Property or property that has not been physically injured, arising out of . . . A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms."  *Id.* at 7.  The Underlying Complaint alleges that AMPCO was required by the terms of its lease "to certify" "whenever asked" "that the lease was in full force and effect." Underlying Complaint at ¶ 14.  Thus, Underlying Plaintiff asserted a breach of contract claim against Plaintiffs for their failure to comply with this provision of the lease, in submitting the Tenant Estoppel Certificate to Whitney National Bank.  *Id.* at ¶ 44.  Failure to comply with this provision of the lease allegedly prevented Underlying Plaintiff from obtaining funding from Whitney National Bank and Aladdin Developers.  *Id.* at ¶ 31.

Plaintiffs deny that they failed to perform a contract.  Plaintiffs' Response to National Union MSJ at 19.  National Union, which bears the burden to "prove the claim is specifically excluded," merely rests on the allegations regarding the breach of contract in the Underlying Complaint and fails to offer proof of those allegations.  *Aydin*, 18 Cal. 4th at

1188.  The Court thus finds that National Union has not carried its burden on the exclusion

for impaired property and DENIES National Union's Motion for Summary Judgment to the

extent that it pertains to the exclusion for impaired property.

### 3.    Exclusion for Expected Property Damage

The Court also finds unavailing National Union's arguments for exclusion based on

the exclusion provision excluding "Property Damage expected or intended from the

standpoint of the Insured."  National Union MSJ, Ex. 5, at 9 (National Union Policy).  The

California Court of Appeals has held that this language "focuses the inquiry on the insured's

actual, subjective expectation, not the expectation of a hypothetical reasonable person."

*Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715, 745 (Cal. Ct. App. 1993).

However, just as with exclusion for impaired property, National Union argues for this

exclusion solely on the basis of the allegations in the Underlying Complaint and fails to

offer any evidence that these allegations are actually true—that Plaintiffs in fact had the

requisite subjective expectation or intent.  Plaintiffs deny that the loss or use of property

was expected or intended.  Plaintiffs' Response to National Union MSJ at 20.  Thus, because

National Union fails its burden of "prov[ing] the claim is specifically excluded," the Court

DENIES National Union's National Union's Motion for Summary Judgment to the extent

that it pertains to the exclusion for expected property damage.  *Aydin*, 18 Cal. 4th at 1188.

### 4.    Exclusion for Personal Injury with Knowledge of Falsity

Finally, National Union argues that claims for personal injury are excluded by the

knowledge of falsity exception which excludes "Personal Injury . . . Arising out of oral or

written publication of material, if done by or at the direction of the Insured with knowledge

of its falsity."  National Union MSJ, Ex. 5, at 8 (National Union Policy).  National Union

argues that the Tenant Estoppel Certificate is knowingly false.  National Union MSJ at 21.

Again, National Union points to allegations in the Underlying Complaint that, if

proven, would show knowledge of falsity.  In addition, National Union cites to the summary

1   judgment order from the Underlying Action claiming that the order demonstrates that "the

2   statements contained within [the Tenant Estoppel Certificate] were knowingly false."

3   National Union MSJ at 22 (citing National Union MSJ, Ex. 4, at 14-15).  National Union

4   mischaracterizes the finding of the court in the Underlying Action.  The court in the

5   Underlying Action found as a matter of law that Plaintiffs could not invoke the affirmative

6   defense of justification, which the court held could be established "through proof of the

7   exercise of either the defendant's own legal rights or a good-faith (but ultimately mistaken)

8   claim to a colorable legal right."  National Union MSJ, Ex. 4, at 14-15.  The court found that

9   AMPCO had no actual legal right to raise the merger problems in the Tenant Estoppel

10  Certificate and also did not have a good-faith belief in an apparent right, supported by

11  objective evidence.  *Id.*  The court explained that in drafting the Tenant Estoppel Certificate,

12  AMPCO relied on "the opinion of an attorney who was not given the opportunity to review

13  the underlying facts fully, and who qualified his answer."  *Id.*  This does not prove that the

14  statements in the Tenant Estoppel Certificate were knowingly false, but rather merely that

15  they were legally incorrect and not objectively justified.

16       National Union also cites to the warranty deed recording the sale of property

17  between IAH 97 and Budget, which states, "It is the intent of the parties not to terminate the

18  existing lease."  National Union argues, with reference to Texas law, that real property

19  records constitute constructive notice.  However, whether this would, in fact, preclude

20  termination of the existing lease requires a legal conclusion, and as the court in the

21  Underlying Action found, AMPCO relied upon the opinion of an attorney in drafting the

22  Tenant Estoppel Certificate.  National Union fails to prove that AMPCO knew that the

23  attorney's opinion was false.  Thus, while the statements in the Tenant Estoppel Certificate

24  may have been legally incorrect and objectively unjustified, National Union fails to prove

25  that constructive notice rendered the statements knowingly false.

26       Finally, National Union cites to Van Meir Suppl. Decl., Ex. 5 which contains

27

28                                            46

documentary evidence from the Underlying Action.  One such document, AMP 001935, is an email dated April 11, 2001—well over two years before the Tenant Estoppel Certificate was sent on August 27, 2003—which states, "There is a MERGER clause in the budget agreement that keeps the budget lease in tact in the event that the lessor and the lessee merge."  This statement, however, is accompanied by other statements that state "Please excuse my ignorance in advance," "I appear to be over my head," and "What do you expect from a rookie."  Van Meir Suppl. Decl. Ex. 5, at AMP 001935.  National Union fails to provide any background on the identity of the sender, the reliability of his statement, or the relationship between his analysis and the knowledge that AMPCO would have had over two years later when it actually sent the Tenant Estoppel Certificate.  Thus, this email fails to prove that the statements in the Tenant Estoppel Certificate were knowingly false.

Plaintiffs deny that they knew they were making false claims in drafting and sending the Tenant Estoppel Certificate.  Plaintiffs' Response to National Union MSJ at 22.  Plaintiffs observe that, as noted above, there was "no determination of falsity" in the Underlying Action.  *Id.*

On balance, because National Union fails its burden of "prov[ing] the claim is specifically excluded," the Court DENIES National Union's Motion for Summary Judgment to the extent that it pertains to the exclusion for personal injury with knowledge of falsity.  *Aydin*, 18 Cal. 4th at 1188.

**F.    Conditions Triggering Policy Coverage**

National Union seeks summary judgment, in the alternative, on the issues 1) that any costs incurred prior to June 23, 2005, the date of tender, are not owed by National Union, and 2) that National Union does not owe a duty to defend because the primary insurance coverage and the self-insured retention have not been exhausted.

**1.    Costs Prior to June 23, 2005**

First, with respect to pre-tender costs incurred, the National Union Policy states "No

Insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expenses, other than for first aid, without our consent."   National Union MSJ, Ex. 5, at 8 (National Union Policy).

The California Supreme Court has enforced insurance policy language "requiring defendants' prior consent to the expenditure of defense costs:

> it is only when the insured has requested and been denied a defense by the insurer that the insured may ignore the policy's provisions forbidding the incurring of defense costs without the insurer's prior consent, and under the compulsion of that refusal undertake his own defense at the insurer's expense.

*Gribaldo, Jacobs, Jones, and Assoc. v. Agrippina Versicherunges A.G.,* 3 Cal. 3d 434 (Cal. 1970).  As National Union argues, California courts consistently honor these conditions unless the insured can show that it was forced to incur those costs before it had time to tender the defense.  *Faust v. The Travelers*, 55 F.3d 471, 472-73 (9th Cir. 1995).

Here, Plaintiffs fail to explain the over one-and-a-half year delay between the filing of the first complaint in the Underlying Action, on December 5, 2003, and the date on which ABM gave notice of the Underlying Action to National Union, on June 23, 2005. SAC at ¶¶ 28, 45.

Therefore, the Court GRANTS National Union's Motion for Summary Judgment to the extent that any costs incurred prior to June 23, 2005, the date of notice, are not owed by National Union.  National Union Reply at 2.

### 2.    Duty to Defend

Second, with respect to the duty to defend, the National Union Policy states,

> We will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay . . . .

> We shall have the right and duty to defend any claim or suit seeking damages covered by the terms and conditions of this policy when:
> 1.    The applicable Limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance and the Limits of Insurance of any other underlying insurance providing coverage to the Insured have been exhausted by payment of claims to which this policy applies; or
> 2.    Damages are sought for Bodily Injury, Property Damage, Personal

48

United States District Court

For the Northern District of California

1
2
3

> Injury or Advertising Injury covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the Insured.

National Union MSJ, Ex. 5, at 1 (National Union Policy).  The National Union Policy defines "Retained Limit" as "the greater of either":

> 1. The total of the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other underlying insurance providing coverage to the Insured; or
> 2. The amount stated in the Declarations as Self Insured Retention as a result of any one Occurrence not covered by the underlying policies listed in the Schedule of Underlying Insurance nor by any other underlying insurance providing coverage to the Insured:
>
> and then up to an amount not exceeding the Each Occurrence Limit as stated in the Declarations.

*Id*. at 3.

National Union argues that it owes no duty to defend under the terms of the Policy because the Retained Limit has not been exhausted.  This argument fails as a factual matter.  National Union and Plaintiffs dispute the actual Retained Limit in this case.  Plaintiffs argue that the Retained Limit is $1,000,000, because $1,000,000 is the per-occurrence limit of liability provided by the Zurich Policy, which is listed in the National Union Policy's Schedule of Underlying Insurance.  Plaintiffs' Response to National Union MSJ at 3 n. 2.  National Union argues that, if Plaintiffs' claims are not covered by the Zurich Policy, the Retained Limit may be $3,000,000, because $3,000,000 is the self insured retention under the National Union Policy.  National Union Reply at 2-3; National Union MSJ, Ex. 5.  The Court is unable to determine the proper measure of Retained Limit, as Zurich and Plaintiffs have withdrawn—pursuant to a settlement agreement—all arguments regarding whether the Zurich Policy provides coverage for Plaintiffs' claims.  However, determining the actual Retained Limit is irrelevant to this case, as National Union's argument fails under either measure of Retained Limit.

National Union argues that the "National Union [P]olicy provides

49

coverage—including defense—if, and only if, the underlying policies or the $3 million self-insured retention are exhausted by payment of settlement.  It is undisputed that neither the Zurich [P]olicy nor the $3 million self-insured retention occurred to trigger National Union's duty to defend."  National Union Reply at 3.  Well before the filing of the Second Amended Complaint in this case, Plaintiffs paid $6,300,000 to settle the Underlying Action with Underlying Plaintiff.  Auwers Affidavit at ¶ 6 (affidavit, dated March 14, 2006, declared that the Plaintiffs had paid Underlying Plaintiff $6,300,000).  This amount is in excess of both the $1,000,000 per-occurrence liability limit provided by the Zurich Policy and the $3,000,000 self-insured retention.  Thus, regardless of the proper measure of the Retained Limit, National Union fails to prove that the Retained Limit has not been exhausted.  Therefore, the Court DENIES National Union's Motion for Summary Judgment to the extent that it argues that the Retained Limit has not been exhausted in this matter.

## CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT Plaintiffs' Motion for Partial Summary Judgment [Docket No. 30] is DENIED; National Unions' Motion for Summary Judgment [Docket No. 36] is GRANTED, except to the extent that National Union argues that the Retained Limit of the National Union Policy has not been exhausted in this matter.

IT IS FURTHER ORDERED THAT Plaintiffs' objections to Exhibit 5 of the Supplemental Declaration of Ellen Van Meir are OVERRULED [Docket No. 56], and National Union's objections regarding paragraphs 11-12, 16, and 18 of the Sances Affidavit for Plaintiffs' MSJ are SUSTAINED [Docket No. 42].  The Court STRIKES paragraphs 11-12, 16, and 18 of the Sances Affidavit for Plaintiffs' MSJ from the record.  The Court OVERRULES National Union's objection regarding paragraph 19 [Docket No. 42].

IT IS SO ORDERED.

*Saundra B Armstrong*

1

2  Dated:  9/11/06

       SAUNDRA  BROWN  ARMSTRONG
       United States District Judge

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California